IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GEORGE M. DeCURTIS, JR., | : | CIVIL ACTION NO. **3:CV-05-0118** |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Magistrate Judge Blewitt |
| | : | |
| METROPOLITAN LIFE INS.  COMPANY, | : | |
| | : | |
| Defendant | : | |

## MEMORANDUM

This action, which arises under the Employee Retirement Income Security Act of 1974,

as amended, 29 U.S.C. Section 1001, *et seq*.  ("ERISA"), was filed on January 18, 2005.

(Doc. 1).  Plaintiff, George M. DeCurtis, Jr., alleges that he had a long term disability ("LTD")

policy with Defendant Metropolitan Life Insurance Company ("Metropolitan"), and that

Defendant wrongfully terminated his benefits by finding that he was capable of performing

some types of work.  Plaintiff seeks the reinstatement of his disability benefits by Defendant and

for the back- payment of all unpaid disability benefits.  Defendant filed an Answer to the

Complaint on March 11, 2005.  (Doc. 4).  Defendant essentially asserts that it properly

terminated Plaintiff's long-term disability benefits on August 26, 2002.

On January 13, 2006, Plaintiff filed a Motion for Summary Judgment along with a

support Brief and exhibits. (Docs. 22 & 23).  On January 13, 2006, Defendant filed a Motion for

Summary Judgment along with its support Brief.  (Docs. 18 & 19).[1]  Defendant filed exhibits on

---

[1]Plaintiff's Brief in support of his Summary Judgment Motion and attached exhibits were
docketed separately as Documents 23 & 24.  Doc. 23 is Plaintiff's Brief without exhibits; Doc.
24 is a copy of Plaintiff's Brief with attached exhibits.

January 17, 2006.  (Doc. 25).  Both parties have filed Statements of Undisputed Material Facts

("SMF") as well as responses to each other's SMF's.  (Docs. 20, 21, 27 & 29).  Both parties also

responded to each's other Summary Judgment Motions.  (Docs. 26 & 30).

The cross-Motions for Summary Judgment have been briefed and are presently ripe for

disposition.[2]

## I.  Summary Judgment Standard.

A motion for summary judgment may not be granted unless the moving party is entitled

to judgment as a matter of law.  Fed.R.Civ.P. 56.  The court may grant a motion for summary

judgment if the pleadings, depositions, answers to interrogatories, admissions on file, and any

affidavits show that there is no genuine issue as to any material fact.  Fed.R.Civ.P. 56(c).  An

issue of fact is "'genuine' only if a reasonable jury, considering the evidence presented, could

find for the nonmoving party."  *Childers v. Joseph*, 842 F.2d 689, 693-694 (3d Cir. 1988) (*citing*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

The burden of proving that there is no genuine issue of material fact is initially upon the

movant.  *Forms, Inc. v. American Standard, Inc.*, 546 F. Supp. 314, 320 (E.D. Pa. 1982), *aff'd*

*mem.* 725 F.2d 667 (3d Cir. 1983).  Upon such a showing, the burden shifts to the nonmoving

party.  *Id*.  The nonmoving party is required to go beyond the pleadings and by affidavits or by

"depositions, answers to interrogatories and admissions on file" designate "specific facts showing

that there is a genuine issue for trial."  Fed.R.Civ.P. 56(e).

---

[2]On June 3, 2005, the District Court reassigned this case to the undersigned for all
matters after the parties consented to proceed before a U.S. Magistrate Judge pursuant to
28 U.S.C. § 636(c). (Doc. 10).

In determining whether an issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. *White v. Westinghouse Electric Company*, 862 F.2d 56, 59 (3d Cir. 1988). In doing so, the court must accept the nonmovant's allegations as true and resolve any conflicts in his favor. *Id.*, *quoting Gans v. Mundy*, 762 F.2d 338, 340 (3d Cir. 1985), *cert. denied*, 474 U.S. 1010 (1985); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976) *cert. denied*, 429 U.S. 1038 (1977).

## II. Undisputed Material Facts.

Plaintiff and Defendant have filed their respective Statements of Undisputed Material Facts (SMF's) in support of their Summary Judgment Motions as required. (Docs. 20 & 21). *See* Local Rule 56.1, M.D. Pa. Plaintiff has responded to Defendant's SMF. (Doc. 29). Defendant has also responded to Plaintiff's Statement of Material Facts in support of his Summary Judgment Motion. (Doc. 27).

The parties agree upon the following material facts in this case as detailed in Plaintiff's SMF. (*See* Doc. 21 & corresponding ¶'s from Doc. 27).[3]

1. On or about September 14, 1994, the Plaintiff became employed by Sears-Roebuck & Company, where he was a member of the Customer Appliance Sales and Service Department.

---

[3]For sake of clarity, we use the paragraph numbers as contained in Plaintiff's SMF. (Doc. 21). We also note that "A.R." herein refers to the Administrative Record, Doc. 25, Parts I (A.R. 1 - 431) and II (A.R. 432-1006).

4.   The Plan unambiguously grants MetLife discretionary authority to determine eligibility for and entitlement to benefits and to interpret Plan Terms.

9.   Plaintiff filed his application for LTD benefits on September 30, 1998, which application claimed disability due to chronic back pain secondary to his lumbar laminectomy and depression.

11.   The same plan provides for payment of LTD benefits for a maximum of twelve consecutive months if the disability results from a mental and nervous disorder.

13.   By letter dated December 29, 1998, MetLife denied Plaintiff's claim and after receiving Plaintiff's appeal letter and the psychiatric medical records of Dr. Gazda, the claim was approved on 3/1/99 after a Board-certified psychiatrist for MetLife recommended the approval of benefits based on sufficient data of depression and panic attacks rendering Plaintiff totally disabled per MetLife's definition of disability effective October 2, 1998.

14.   The claim was approved for twelve months in accordance with the 12-month provision of MetLife's LTD Plan.

16.   The Plaintiff applied for Social Security Disability Benefits on March 3, 1999, alleging disability beginning May 14, 1998, the day he last worked, due to back and left leg pain and major depression.

17.   The Social Security Administration ("SSA") found that the Plaintiff was under a disability as defined by the Social Security Act and Regulations, commencing May 14, 1998, and

4

Case 3:05-cv-00118-TMB   Document 32   Filed 05/16/06   Page 5 of 33

continuing to the date of the Decision which was April 28, 2000.  (A.R. 325-337). [4]

26.  Based on the reporting of Dr. Sanitate, MetLife recommended a Transferable Skills Assessment to determine if commensurate jobs could be found within the functional limitations established by the doctor.

27.  On 7/19/01, occupations were identified in the Transferable Skills Analysis Report.

29.  By letter dated August 28, 2001, MetLife terminated Plaintiff's benefits effective 10/1/01.

32.  On 10/24/01 an appeal of the termination was received by MetLife and benefits were reinstated effective 10/1/01.

33.  Following Plaintiff's surgery of 9/7/01, MetLIfe requested all records of Plaintiff's post-operative care and treatment by Dr. Sedor.

35.  In June of 2002, MetLife had Plaintiff's medical records reviewed by Robert C. Porter, M.D., whose specialty is occupational medicine.

37.  On August 16, 2002, a Transferable Skills Analysis was done by a vocational expert identifying jobs that Plaintiff could perform.  The consultant who authored the Analysis never

---

[4]The Social Security Administration ("SSA") determined that Plaintiff was disabled as of May 14, 1998.  (A.R. 333-337).  The Social Security Administration requires that a person be disabled for five full calendar months in a row before they begin to pay benefits.  Social Security determined that from May 1998 through April 2000, Plaintiff was disabled and, accordingly, began to pay him benefits commencing November 1998 (*i.e.* 5 months after May 1998). (A.R. 325).  Plaintiff was found to have severe impairments of lumbar disc disease and recurrent major depression.  (*Id.*, 336).  This time period that the Social Security Administration found Plaintiff  to be disabled (*i.e.* May 1998 through April 2000) coincided in part with  time period in which MetLife approved Plaintiff for long-term benefits (*i.e.* March 1999 through August 2002).  MetLife made a final determination that as of August 26, 2002, Plaintiff was no longer entitled to long-term benefits.

5

interviewed the Plaintiff nor was made aware of his physical or mental complaints other than to know that according to Dr. Porter, that Plaintiff's complaints "are out of proportion to his pathology."

38.   A Transferable Skills Analysis done by the vocational expert on August 16, 2002 was based solely upon the information supplied to the vocational consultant by Dr. Porter dated June 27, 2002 and August 8, 2002.

39.   The reports of Dr. Sedor were never reviewed by the vocational consultant performing the Transferable Skills Analysis.

40.   The Transferable Skills Analysis performed on or about August 16, 2002 makes no reference to the effect of Plaintiff's depression/anxiety disorder, or did the report of July 19, 2001.

42.   Plaintiff appealed the decision to terminate his benefits on 12/15/02.

43.   MetLife had Plaintiff's records reviewed by Dr. James Sarno, a neurosurgeon, following Plaintiff's request for an appeal.

44.   Dr. Sarno's report refers to 59 separate documents reviewed by him at the request of MetLife, all dealing with Plaintiff's medical management dating back as far as 1993.

45.   The records reviewed by Dr. Sarno included extensive references to the Plaintiff's psychiatric and physical impairments.

47. MetLife's last payment of Plaintiff's LTD benefits was made in August of 2002.[5]

The parties also agree upon the following material facts in this case as detailed in Defendant's SMF. (*See* Doc. 20 & corresponding ¶'s from Doc. 29).[6]

1. Plaintiff, George DeCurtis, Jr., began his employment with Sears on September 26, 1994 and worked for Sears as a sales associate in its major appliance department until May 14, 1998. (Employer's Statement of LTD Claim; A.R. 566-576).

2. As a Sears employee, plaintiff participated in the Plan. (A.R. 566).

3. The Plan provides long-term disability benefits to certain employees of Sears who are "totally disabled."

4. The Plan (A.R. 17-44) defines the term, "Totally Disabled," as follows:

> 1. During the Waiting Period and for the next 24 consecutive months, "Total Disability" means that because of illness or injury, you cannot do your own job or any other job for which you are reasonably qualified based on your training, education and experience.
>
> 2. After the time period, you will no longer be considered Totally Disabled unless MetLife considers you to meet the above definition <u>and</u> you are approved to receive and/or are receiving Social Security benefits do to your disability or age.

---

[5] ¶'s 28, 37-40, 45 of Plaintiff's SMF (Doc. 21) are admitted in part by Defendant, in that they are admitted for content but are denied with respect to any implications from these SMF's of Plaintiff. *See* Doc. 27.

[6] For sake of clarity, we use the paragraphs numbers as contained in Defendant's SMF. (Doc. 20).

(A.R. 26; Emphasis in original).

5.  MetLife serves as Claim Fiduciary under the Plan and, as such, is vested with the

following responsibilities:

> MetLife has the responsibility of Claim Fiduciary for the provision
> of full and fair review of claim denials pursuant to section 503 of ERISA.

(A.R. 41).[7]

6.  The Plan affords MetLife, which, as Claim Fiduciary, is a Plan fiduciary, discretionary

authority as follows:

> In carrying out their respective responsibilities under the Plan, the
> Plan Administrator and other Plan fiduciaries shall have the
> discretionary authority to interpret the terms of the Plan and to
> determine eligibility for and entitlement to Plan benefits in accordance
> with the terms of the Plan.  An interpretation or determination made
> pursuant to such discretionary authority shall be given full force and
> effect, unless it can be shown that the interpretation or
> determination was arbitrary or capricious.

(A.R. 41).

7.  Plaintiff's last day of work at Sears was May 14, 1998. (A.R. 566-568).

10.  MetLife's December 29, 1998 denial letter also referenced medical records

provided by Dr. Stephen Boone, Dr. Allen Friedman, Dr. James Heinz, Dr. Michael Fajgenbaum

and records from plaintiff's physical therapist. (A.R. 433).

---

[7]Thus, MetLife is not the Administrator the Plan.  Rather, the Plan is administered by Sears Roebuck and Co. through its Manager, Personnel Policy and Technical Support.  (A.R. 41). *See* Doc. 27, ¶ 3.

11.  Finally, the December 29, 1998 denial letter stated that, in denying plaintiff's disability claim, MetLife had considered the education, training and experience statement completed by plaintiff on October 1, 1998, which indicated that plaintiff had a master's degree in psychology and had prior experience as an office manager, a medical and dental claims reviewer, and an insurance adjuster. (A.R. 433).

14.  Having received Dr. Gosline's evaluation, MetLife, by letter dated March 1, 1999, notified plaintiff that, after review, his claim for long-term disability benefits had been granted. (A.R. 386-388).

16.  On July 19, 2001, MetLife obtained a Transferable Skills Analysis Report ("TSA Report") which noted that plaintiff's functional limitations correspond to sedentary/to light duty work, with the ability to change position," and identified five occupations compatible with these limitations which were estimated to provide wages commensurate with plaintiff's gross long-term disability benefit and which were found to be available in the area where plaintiff lived. (A.R. 289-290).

17.  On August 28, 2001, MetLife notified plaintiff that it was terminating his long-term disability benefits effective October 1, 2001, based upon the physical capacities evaluation of Dr. Sanitatis and the July 17, 2001 TSA Report. (A.R. 256-258).

18.  By letter dated September 4, 2001, plaintiff requested review of MetLife's termination of his long-term disability benefits. (A.R. 309-310).

19.  In connection with his request for review, plaintiff submitted medical records showing that he had been under the care of David J. Sedor for back pain since at least May of

2000, that conservative treatment had failed to alleviate his pain, and that he had been hospitalized from September 7-11, 2001 for back surgery. (A.R. 308-322).

20.  By letter dated November 9, 2001, MetLife notified plaintiff that, based upon a review of medical and vocational information submitted by him and his physicians and the documentation in his claim file, plaintiff qualified for long-term disability benefits.  The letter, accordingly, reinstated plaintiff's benefits effective October 1, 2001. (A.R. 307).

21.  The following year, after receiving updated medical information regarding plaintiff's condition, MetLife obtained an Independent Physician Consultant's Report ("IPC Report") from Robert C. Porter, M.D., a board-certified specialist in Occupational Medicine.  Dr. Porter's IPC Report, dated June 27, 2002, concluded that the information provided by plaintiff's treating physicians "[did] not demonstrate significant functional impairments at the present time to require ongoing work loss." (A.R. 130-131).

23.  On August 16, 2002, MetLife obtained an additional TSA Report identifying four jobs involving sedentary to light duties  for which plaintiff was suited by virtue of his education and training and for which employers were noted to exist in the area where plaintiff lived. (A.R. 116-117).

24.  By letter dated August 26, 2002, MetLife informed plaintiff that the evidence in its files regarding plaintiff's physical condition, experience and training did not support the continuation of plaintiff's long-term disability benefits after August 31, 2002. (A.R. 112-115).

25.  MetLife's August 26, 2002 letter noted that plaintiff's educational background included a Bachelor of Arts degree and a Master of Arts Degree in Psychology and that his work

10

history included employment as an insurance claims adjuster, a medical and dental claims approver and a medical office manager. (A.R. 113).

26.  MetLIfe's August 26, 2002 letter also stated that plaintiff's medical records showed that he had "adequate time to recover from surgery" and suffered from "no neuromuscular deficits that would require significant restrictions and limitations," and that there was "no evidence of a re-injury or condition that demonstrated significant functional impairments at the present time, to require restrictions and ongoing work loss." (A.R. 113).

27.  Finally, MetLife's August 26, 2002 letter mentioned plaintiff's lifting capabilities and identified three jobs available in plaintiff's geographic area, which MetLife's August 16, 2002 TSA Report had found to be suited to his physical abilities, education and work history. (A.R. 114).

28.  On December 15, 2002, plaintiff appealed MetLife's termination of his long-term disability claim. (A.R. 102).  Plaintiff also supplied copies of Dr. Sedor's office notes of September 16, 2002 and December 30, 2002. (A.R. 96-98).

29.  On February 7, 2003, plaintiff sent a letter to MetLife advising he had been in a motor vehicle accident and was under the care of his new primary care physician, Dr. Mitchell D. Hardison, for pain associated with the accident. (A.R. 92).

32.  By letter dated April 9, 2003, MetLife notified plaintiff of its determination to uphold the termination of his long-term disability benefits effective September 1, 2002.  The said letter recited the history of plaintiff's claim, described the medical records reviewed by MetLife and referenced the fact that MetLife had obtained an additional review of plaintiff's claim by a

board-certified neurosurgeon. (A.R. 624-626).

Plaintiff also admits in part and denies in part the following paragraphs in Defendant's SMF (Doc. 20, ¶'s 8-9, 12-13, 15, 22, 30-31):[8]

8.   Plaintiff filed an application for long-term disability benefits on September  30, 1998, claiming total disability as a result of "back and leg pain (left side)" and a tear in the cartilage of his left knee which occurred subsequent to his last day of work. (A.R. 568).  Plaintiff's disability application also stated that depression "might interfere with his ability to work." (A.R. 570).

9.   In a letter dated December 29, 1998, MetLife denied plaintiff's application for long-term disability benefits.  The said letter referenced plaintiff's Attending Physician's Statement of Functional Capacity, wherein David Hart, M.D. stated that he could not determine whether plaintiff was totally disabled for his own as well as any occupation that plaintiff could perform based on his training, education and experience. (A.R. 432).

While the letter stated that the doctor could not determine whether Plaintiff was totally disabled for his own as well as any occupation that Plaintiff could perform based on his training, education and experience (A.R. 570), Plaintiff asserts that statement as to total disability has questionable significance considering that when the doctor was asked when the patient would be able to resume work activities, the doctor checked "indefinite for his or her occupation" and "indefinite for any occupation," and that Plaintiff "had not recovered from his injuries, had not improved from his injuries, and had not retrogressed from his injuries." (*Id.*).

---

[8]We have editorialized the stated paragraphs in Defendant's SMF's which Plaintiff has admitted in part and denied in part in order to add Plaintiff's clarifications.

12.  Plaintiff appealed MetLife's denial of benefits on January 18, 1999. (A.R. 428-429). Dr. Gazda, M.D.  (Plaintiff's treating psychiatrist) submitted medical records from two hospitalizations of Plaintiff, subsequent to Plaintiff's last day of work (A.R. 414-429), in which plaintiff had been treated for "major depression, recurrent and adjustment disorder with mixed features." (A.R. 426).

13.  MetLife referred the information received from Dr. Gazda to Ernest Gosline, M.D. for evaluation (A.R. 411), and Dr. Gosline opined that ". . . there is sufficient documentation medically that this EE [plaintiff] is unable to function within his own job or any other occupation from 5/14/98 to the present [February 4, 1999]." (A.R. 407).

15.  On March 12, 2001, as part of an ongoing review of claims, Scott S. Sanitatis, M.D. provided MetLife with a Physical Capacity Evaluation ("PCE"), in which he concluded, *inter alia*, that plaintiff was capable of sitting for 4 hours, standing for 3 hours and walking for 6 hours during a typical 8 hour workday, and capable of lifting 20 pounds. (A.R. 295).

The Plaintiff also asserts that the PCE prepared by Dr. Sanitate speaks for itself, and that it indicated Plaintiff could only lift up to 20 pounds "occasionally," and further excluded fine hand manipulating as subject to bilateral carpal tunnel syndrome.

22.  On August 8, 2002, Dr. Porter provided MetLife with a second Independent Physician Consultant's Report ("IPC"), in which he stated that he had reviewed a June 24, 2002 letter from plaintiff's treating physician, Dr. David Sedor, and had not altered his prior assessment of plaintiff's capabilities. (A.R. 118-119).

13

Dr. Sedor's report of June 24, 2002 stated:[9]

> "At the present time I do not feel the FCE form, as stated on the chart by MetLife, reflects this limitation as well as this narrative does. I do feel at the present time he is not even at sedentary duty with the above limitations, but once again I am hopeful that with time he may get to that point . . . . An FCE has been done, and I understand he was capable of lifting on an isolated basis some limited amounts, perhaps ten to twenty pounds. This data is not available right now. I will review this, but it should be noted that the FCE was done on a very limited basis, on a very limited trial of listing, in a very short time, on a particularly good day, and I do feel after seeing Mr. DeCurtis on numerous occasions, many times pre-operatively as well as many times post-operatively, that he is not capable of working at this time and at best in the future we are hoping for sedentary jobs."
> (AR 750).

In his August 8, 2002 IPC Report, Dr. Porter stated as follows:

> I have been provided with a letter from Dr. David Sedor, a neurosurgeon, dated 06/24/02. Dr. Sedor indicated that he had seen Mr. Decurtis and Mr. Decurtis continued with pain complaints. He indicated "he complains of persistent back tightness and some proximal radicular pain bilaterally. Although some of the hyperalgia has improved, he is still left with residual issues with his chronic mechanical back syndrome and his chronic lumbar radiculopathy." The examination demonstrated a normal straight leg raising test which was improved to 70-80 degrees. Also, his lumbar flexion was 80 degrees which is essentially normal. He did have some spasm in his back. The information in Dr. Sedor's records does not support significant functional impairments or neuromuscular deficits that would require restrictions of work duties. Mr. Decurtis has ongoing pain complaints, however, there is no indication that the surgery was not successful or that Dr. Sedor did not perform the appropriate surgery or that there were intraoperative

---

[9]We use the full language of the June 24, 2002 Report of Dr. Sedor as contained in Plaintiff's Response to Defendant's SMF, Doc. 29, ¶ 22. We also provide the language of the August 8, 2002 IPC Report of Dr. Porter.

> problems.  There is no indication that there were complications of
> surgery such as infection, and there is no indication that he had
> reinjury following surgery.  Mr. Decurtis has exceeded duration of
> disability guidelines for his condition and has no pathology at this
> time that is accounting for his condition and has no impairments.  The
> pain complaints are out of proportion to his present findings and
> there is no indication that he does not have the option and ability
> to return to at least light duty work at the present time.

(A.R. 118).

Dr. Porter also stated:

> In an addendum from Dr. Sedor, it indicates that "an FCE was done
> and I understand he was capable of lifting on an isolated basis some
> limited amounts, perhaps 10 or 20 pounds."  The FCE was not provided.
> The FCE indicated that he can lift 10-20 pounds is consistent with my
> assessment that he is presently able to perform lifting up to 20 pounds.
> The FCE should be considered his minimum abilities and the
> ability to perform at a higher level should be anticipated with
> reconditioning through work activities.

(A.R. 119).

30.  MetLife thereupon obtained Dr. Hardison's office notes from February 3, 2003, as

well as a radiology report dated February 4, 2003. (A.R. 88-90).  The radiology report revealed

only minor degenerative changes at L5-S1 and degenerative and postoperative changes at L4-5.

(A.R. 89).   The report indicated that "[t]here is no abnormal motion with flexion or extension.

There are minimal degenerative changes at the L5-S1 level.   Remaining disc levels are normal.

There is no fracture."  (*Id*.).

The radiographic report further indicates "there has been a prior fusion at L4-5.  There is

disc space narrowing and end-plate sclerosis at this level, there are bilateral pedicular screws at

L4 and L5."   (A.R. 89).

15

31.   On March 14, 2003, MetLife obtained a comprehensive review of plaintiff's medical history by James B. Sarno, M.D., a physician board-certified in neurological surgery and a Fellow of the American Academy of Disability Evaluating Physicians.  Dr. Sarno concluded, following an extensive examination of plaintiff's medical records, that plaintiff was capable of performing sedentary to light duty work. (A.R. 815-828).  He summarized his conclusions as follows:

> Based upon the above documentation, it is my belief that this claimant can return to work on a sedentary to light duty status with maximum lifting of up to 10-15 pounds.  He has had appropriate treatment including spinal fusion at L4 and L5-S1 with metal and bone which was adequate and appropriate.  Based on the FCE which shows evidence of his ability to perform sedentary to light duty work, I conclude that this claimant is capable of such activity.
>
> I would suggest a repeat FCE with appropriate work hardening to return him to gainful employment immediately.

(A.R. 828).

Plaintiff asserts that he denies that Dr. Sarno's conclusions were supported by the record in that Dr. Sarno had no FCE which showed evidence of the Plaintiff's ability to perform sedentary to light duty work, nor did Dr. Sarno identify an FCE upon which he was relying. (Doc. 29, ¶ 31.).

## III. Discussion.

In evaluating an ERISA claim, the first step is to determine which standard of review applies.  "A denial of ERISA plan benefits is reviewed under a *de novo* standard unless the plan administrator has discretion to determine beneficiary eligibility and to construe plan terms." *Thorpe v. Continental Casualty Co.*, WL 31845876, *2 (E.D.Pa., 2002) (citing *Firestone Tire & Rubber Co. v. Bruch*, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)).  The *Firestone* Court held that

"discretionary denials are reviewed under an arbitrary and capricious standard." *Id*.  The

"arbitrary and capricious standard" requires that deference be given to the insurer's  decision,

and that the court not substitute its own judgment for that of the plan administrator. *Sell v.*

*Unum Life Ins. Co. of America*, WL 31630707, 3 (E.D.Pa., 2002) (citing *Mitchell v. Eastman*

*Kodak Co.*, 113 F.3d 422, 439 (3d. Cir. 1997)).   "In this circuit, a 'heightened arbitrary and

capricious' standard applies when the plan administrator's decision was potentially affected by a

conflict of interest." *Thorpe, supra* at 4 (citing *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d

377, 378-379 (3d Cir. 2000)).   Defendant MetLife recognizes this heightened arbitrary and

capricious standard of review in situations where an insurer both  administers and funds the

benefits payable under a plan.  (Doc. 19, p. 9).   In our case, it is undisputed that Defendant

was responsible for paying benefits under the Plan, as well as for determining eligibility for

benefits under the Plan.  (*Id*.).

        As in the instant case, a conflict of interest arises when "an insurer, acting as plan

administrator, both decides employee claims and pays those claims out of its own funds." *Id*.

Furthermore, as Defendant states (*Id*., pp. 9-10), with a heightened arbitrary and capricious

standard of review, the court must be "deferential, but not absolutely deferential" and "look not

only at the result–whether it is supported by reason– but at the process by which the result was

achieved." *Thorpe, supra* at 4 (citing *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d at 378-

379).  "In this Circuit, the amount of deference given to the insurer under the heightened

arbitrary and capricious standard is determined on a case-by-case basis along a sliding scale."

*Pinto*, 214 F.3d at 392. As Defendant indicates (*Id*., p. 9), some factors which may be

considered when determining where on the sliding scale the standard should fall are: 1) the sophistication of the parties; 2) the information accessible to the parties; 3) the exact financial arrangement between the insurer and the company; and 4) the current financial status of the fiduciary. *Id.* Generally, "a court should look at any and all factors that might show a bias and use common sense to put anywhere from a pinky to a thumb on the scale in favor of the administrator's analysis and decision." *Thorpe, supra* at 3 (citing *Gritzer v. CBS, Inc.*, 275 F.3d 291, 295 n. 3 (3d Cir. 2002)).

Finally, in assessing long-term disability claims, the Third Circuit has held that the plaintiff has the burden of proving that defendant's denial of benefits was arbitrary and capricious. *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 439 (3d Cir. 1997); *Foley v. International Brotherhood of Elec. Workers Union 98 Pension Fund*, 271 F.3d 551, 559 n. 9 (3d. Cir. 2001) (Plaintiff had burden of proof in claim for benefits under 29 U.S.C. § 1132(a)(1)(B)). Furthermore, the plaintiff also has the burden of proving that he cannot perform any of the substantial and material duties of his occupation. *Russell v. Paul Revere Life Ins. Co.*, 288 F.3d 78 (3d Cir. 2002). Additionally, there is no heightened burden of explanation on administrators when they reject the opinion and/or recommendations of the treating physician. *The Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 123 S.Ct. 1965, 1970 (2003) (commenting that nothing in ERISA suggests that plan administrators must accord special deference to the opinions of treating physicians.).

We agree with Defendant that our Plaintiff does not point to any factors which would further heighten the above-mentioned standard of review. (*Id.*, p. 10). Further, based on the

18

stated factors, we find that a slightly heightened arbitrary and capricious standard of review should be applied in this case.  Thus, we apply a slightly heightened standard of review to Defendant's termination of Plaintiff's LTD benefits.  We shall be deferential, but not absolutely deferential, to the result of Defendant's decision as well as the process by which the result was achieved.  *See Thorpe*, *supra* at 4.

In the present case, Defendant states that in this action governed by ERISA, this Court must constrain its review to the Administrative Record ("A.R.").  (Doc. 25).  (Doc. 20, p. 1).  Defendant states that Plaintiff seeks benefits under the long-term disability plan which Sears, his employer, provided.  The Plan gave MetLife, as Claim Fiduciary, discretionary authority to determine eligibility for benefits and to interpret the Plan's provisions.  Thus, according to Defendant, the above stated arbitrary and capricious standard of review is applicable in this case.  (*Id*.).  Plaintiff concurs that this is the standard of review, and argues that Defendant acted in an arbitrary and capricious manner when it terminated his LTD benefits.  (Doc. 24, p. 1).[10] Plaintiff also agrees with Defendant that the Plan at issue gave Defendant discretionary authority to determine eligibility for benefits and to construe the terms of the Plan.  (Doc. 24, p. 6).  Thus, both parties agree that the Defendant's decision in our case is to be reviewed by this Court under the heightened arbitrary and capricious standard.  (*Id*., pp. 6-7 & Doc. 19, p. 9).  As Plaintiff indicates (*Id*., p. 7), and Defendant concurs (Doc. 19, p. 8), under the arbitrary and capricious standard, "the district court may overturn a decision of the Plan administrator only if

_____

[10]Since, as noted above, Plaintiff's Brief at Doc. 23 and at Doc. 24 are the same except that Doc. 24 contains the Plaintiff's exhibits, we shall refer to Doc. 24 herein as it is Plaintiff's complete filing.

it is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *See*

*Abnathya v. Hoffman-LaRoche, Inc.*, 2 F. 3d 40, 45 (3d Cir. 1993); *Pinto v. Reliance Standard Life*

*Ins. Co.*, 214 F. 3d 377, 393 (3d Cir. 2000).

> Further, we agree with Defendant that:

> > "This scope of review is narrow, and the court is not free to
> > substitute its own judgment for that of the [administrator] in
> > determining eligibility for plan benefits." *Mitchell v. Eastman
> > Kodak Co.* 113 F.3d 433, 439 (3d Cir. 1997) (citations omitted).
> > In conducting its review of the administrator's decision, a court
> > must look to the "record as a whole," which "consists of that
> > evidence that was before the administrator when he made the
> > decision being reviewed." *Id.* at 440 (citations omitted).
> > *See also Kosiba v. Merck & Co.*, 384 F.3d 58 (3d Cir. 2004).

(Doc. 19, p. 8)

> In our case, we look to the record as a whole in reviewing MetLife's decision of August

26, 2002, in which Plaintiff's LTD benefits were terminated based on MetLife's finding that

Plaintiff was no longer totally disabled pursuant to the Plan.  We agree with the parties, as

discussed above, that Defendant's decision to terminate Plaintiff's LTD benefits is to be

reviewed by this Court under the slightly heightened arbitrary and capricious standard.  Plaintiff

has the burden of proving that Defendant's denial of benefits was arbitrary and capricious.  In

his Motion for Summary Judgment, Plaintiff also argues that Defendant's decision to terminate

his LTD benefits was not reasonable.  (Doc. 22, ¶ 3.).  Defendant argues that is determination

that Plaintiff was no longer totally disabled was reasonable and supported by substantial

evidence as contained in the A.R.  (Doc. 19, p. 10).  Thus, the question for this Court is whether

Defendant's decision to terminate Plaintiff's LTD benefits was reasonable and supported by

substantial evidence considering the record as a whole.

In *Thorpe, supra,* the Plaintiff was granted long term disability benefits due to her Meniere's disease and chronic fatigue syndrome. Plaintiff received these benefits from September 1, 2000, through June, 2001, at which time the Defendant insurance company (Continental Casualty Co.) terminated the long term disability payments based on information in the Plaintiff's file which "did not indicate a physical or psychological impairment that rendered plaintiff disabled under the plan as of June 30, 2001." *Thorpe*, *supra* at 1. The *Thorpe* Court first recognized the conflict of interest created by the fact that Continental determined who receives benefits under the plan and also pays those benefits. Consequently, the court applied the "heightened arbitrary and capricious" standard. *Id*. The court then determined that Continental gave more weight to the "results of a cognitive test and the opinion of a nurse who reviewed the file and whose only contact with plaintiff was over the phone than it did to the opinion of two treating physicians." *Id*. Based on this determination, and applying the heightened arbitrary and capricious standard, the court granted Plaintiff's motion for summary judgment holding that the evidence did not support the Defendant insurance company's decision to terminate Plaintiff's long term disability benefits. *Id*. The court further stated that their conclusion was "bolstered" by the Social Security Administrations's decision to grant plaintiff disability benefits. *Id*.

Conversely, the Court in *Sell v. Unum Life Ins. Co. of America,* WL 31630707, *8 (E.D.Pa. 2002)*, granted the Defendant Insurance Company's motion for summary judgment. In *Sell,* the Court determined first that the heightened arbitrary and capricious standard should be

applied. *Id*. at 6.  The Plaintiff in *Sell* argued that the Defendant's decision to terminate

Plaintiff's long term benefits was arbitrary and capricious because the Defendant chose to

terminate the benefits in spite of a letter written by Plaintiff's physician which suggested that

Plaintiff was in fact unable to work.  *Id*. at 7.  The court, however, determined that Defendant's

decision to terminate long term benefits was not arbitrary and capricious because the letter from

Plaintiff's physician was in direct contrast with his earlier opinion, and this new opinion was not

based on any further medical examination of Plaintiff.  Therefore, the court determined that

Defendant's decision to go against the recommendation of Plaintiff's physician and to deny

long- term benefits was not arbitrary and capricious.  *Id*. at 7.  The court also stated that "[a]

social security administration disability award is not dispositive in determining whether a plan

administrator's denial of benefits was arbitrary and capricious, but it is a factor to consider."  *Id*.

at 7.

Contrary to *Thorpe* and *Sell*, Defendant MetLife, in making its decision to terminate

Plaintiff's claim for long-term disability benefits, has relied upon the records of Plaintiff's treating

physicians, as well as the reports of  medical consultants that it has retained.  We agree with

Defendant (Doc. 19, p. 10), that its decision was based on Plaintiff's medical records as well as

the reports of medical consultants in the A.R.  Also, as Defendant points out (*Id*.), Plaintiff does

not challenge its decision on the basis that Defendant failed to consider the medical records and

reports.  Rather, Plaintiff alleges as follows:

> In reviewing the Defendant's denial of Plaintiff's benefits, it becomes
> apparent that the Decision of the Defendant was arbitrary and
> capricious and not made in good faith when it failed to recognize
> not only the Plaintiff's physical impairments, but gave no recognition

> to the major depression for which Plaintiff continued under treatment.
> As such, the Decision of the Defendant denying Plaintiff's benefits is
> unsupported by substantial evidence, erroneous as a matter of law,
> and in violation of ERISA.

(Doc. 1, ¶ 13.).

This claim is apparent in light of Plaintiff's first argument in his Brief, in which he

contends that Defendant acted arbitrarily and capriciously in terminating his LTD benefits

because it failed to consider the combination of his mental and physical impairments.  (Doc. 24,

p. 16).  Thus, Plaintiff is claiming that Defendant's decision finding him no longer totally

disabled was not based on his physical and mental impairments, and therefore it was not

reasonable and supported by substantial evidence.  Further, Plaintiff argues that he has

identified his impairments since the onset of his claim, as both physical and mental (*i.e.*

functional and non-functional impairments), and that Defendant's decision was not reasonable

since it failed to consider the severity of his mental impairments (severe depression and anxiety),

which taken in conjunction with his physical impairments, would have still rendered him totally

disabled beyond August 2002 under the Plan.  In fact, Plaintiff points to the SSA decision in

which it was concluded that "the exertional and nonexertional limitations caused by [Plaintiff's]

impairments [chronic pain from fibromyalgia and lumbar disc disease, depression and anxiety],

in combination preclude him from performing  even sedentary work of a regular and sustained

basis." (A.R. 335).   Based on this finding, SSA awarded Plaintiff disability insurance benefits

from May 14, 1998 through April 28, 2000.  As stated above, the SSA's decision is not

determinative in our case, but provides some evidence of Plaintiff's disability.  However, since

Defendant in our case  had granted Plaintiff's claim for LTD benefits from May 1998 through

23

August 2002, a longer period of time than the SSA DIB award, and a time period encompassing the SSA award, we fail to see how the SSA award helps support Plaintiff's position in this case.

Plaintiff argues that Defendant erroneously, arbitrarily and capriciously terminated his LTD benefits by only considering his back condition, and by not also considering his severe depression and anxiety which were referenced throughout his medical records.  Plaintiff claims that Defendant's decision to terminate his benefits was not reasonable because it failed to consider both his functional and non-functional limitations due to his physical and mental impairments.   Plaintiff points to the reports of Dr. Gazda, his treating psychiatrist, as well as Dr. Sanitate's reports, and his 1999 hospital psychiatric treatment.  Plaintiff also states that Dr. Gosline indicated on February 4, 1999, that he was on heavy doses of anti-psychotic medications.  (Doc. 24, pp. 17-18).  (*See also* A.R. 59, Doc. 25, Part I).  The record also indicates that in October 1998, Plaintiff was hospitalized for two days for suicidal ideation.  (A.R. 59).  Plaintiff argues that the vocational consultant failed to consider his psychiatric impairments in the 2001 report.  (Doc. 24, p. 18).  Thus, Plaintiff asserts that the report did not consider both his physical and mental impairments in determining if he was capable of performing work.  Plaintiff contends that Defendant's decision to terminate his LTD benefits at the end of August 2002 was based solely and entirely on his physical impairments, and his functional limitations caused by these impairments.  Plaintiff states  that Defendant failed to consider his mental impairments in deciding if he was still eligible for LTD benefits, and that this rendered Defendant's decision arbitrary and capricious.  (*Id.*, p. 19).

We must consider Plaintiff's condition after August 26, 2002, the time when Defendant terminated Plaintiff's LTD benefits.  We must also consider whether Defendant's decision that Plaintiff was no longer totally disabled pursuant to the Plan was reasonable and supported by substantial evidence based on the record as a whole.

Significantly, as Defendant indicates (Doc. 19, p. 11), in Plaintiff's December 15, 2002 appeal of Defendant's August 26, 2002 decision terminating his LTD benefits, Plaintiff made only a passing reference to his mental impairments as a basis for his appeal.  (*See* A.R. 850-855, Doc. 25, Part II).  While Plaintiff relies mostly upon his back surgery, cervical spine problems, his elbow impairment with neuropathy and carpal tunnel syndrome in his appeal, he only briefly mentioned his psychiatrist.  (A.R. 855).  We agree with Defendant that Plaintiff's own appeal is not indicative that he was claiming to have suffered in any way from severe mental impairments after August 2002.  (Doc. 19, p. 11).

Both parties acknowledge that the Plan itself had, by its very terms, a time limitation as to a mental disability.  (*Id*. & Doc. 24, pp. 18-19).  The Plan undisputedly provided as follows with respect to a mental disability:

> Mental/Nervous Disorders
>
> Payments of LTD benefits is limited to a maximum of 12 consecutive months if the disability results from a mental and nervous disorder.
>
> A disability is due to a mental and nervous disorder if:
>
> - it is due to mental or emotional disease or disorder of any kind; and
>
> - you would not be Totally Disabled in the absence of the mental and nervous disorder.

25

> However, if you are confined at the end of that 12-month period
> in a hospital or other similar institution which is licensed to
> provide care and treatment for such disorders, then L TD benefits
> will continue during the time that you continue to be confined
> (but not beyond the Maximum Benefit Period), and will stop
> immediately upon your discharge.  You will not be eligible for
> any further benefits for that disability, even if it recurs.

(A.R. 29).

The record, as Plaintiff recognizes (Doc. 24, p. 18), discussed Plaintiff's hospitalization in

October 1998 for suicide ideation and Dr. Gosline's February 4, 1999 report that Plaintiff was

on heavy doses of anti-psychotic medications, but it also indicated that Plaintiff "expired 1 yr

m/n limit 10/1/99."  (A.R. 59).  As Defendant states (Doc. 19, p. 11), Plaintiff's claim that it failed

to consider his mental impairments in combination with his physical impairments after August

2002, is of little significance since, under the plain language of the Plan, LTD benefits for a

mental disorder beyond a 12-month period are available only if the claimant is confined to a

hospital or institution.  In our case, we agree with Defendant that Plaintiff does not claim to

have been hospitalized or institutionalized due to his mental impairments after August 2002,

and thus he exhausted any disability claim due to mental impairments on May 14, 1999, one

year after his disability onset date.  (Doc. 19, p. 11).  Therefore, we find that Defendant acted

reasonably and within its discretion under the Plan by not considering whether Plaintiff was

suffering from a mental impairment at the time it terminated his LTD benefits in August 2002.

We also agree with Defendant, as discussed above, that Plaintiff does not point to any

medical evidence of a mental disability as of August 2002.  While Plaintiff points to the March

12, 2001 report of Dr. Sanitate, which mentioned Plaintiff's depression and his hospital

psychiatric treatment in 1999, he does not point to records at the time of his termination in

August 2002 which show a disabling mental impairment.  (Doc. 24, p. 18).  Plaintiff also refers

to a December 25, 2004 Psychiatric Assessment done during a hospitalization at First Hospital

Wyoming Valley.  (*Id.*, p. 19, n. 3).  Plaintiff acknowledges that this Assessment was not part of

the instant record, but offers them to show his continued "disturbing mental state."  (*Id.*).  Even

if we consider this evidence which was not presented to Defendant and is not in the current

record under review, it does not show that Plaintiff was institutionalized for a mental disorder as

required by the Plan.  Thus, he has still exhausted any mental disability benefits to which he was

entitled under the language of the Plan.  This new evidence shows that Plaintiff was discharged

on January 5, 2005, and that his discharge prognosis was "Good."  (Doc. 24, Ex. P).  Plaintiff's

GAF was 65.[11]  (*Id.* at p. 1).  The discharge report also stated:

> At the time of discharge, he was clearly not a risk to himself or
> others, future oriented, and looking forward to discharge.
> Medication teaching was done prior to discharge and he was
> aware of both how and when to take the medications and the
> risks involved in taking them.

(*Id.*, p. 2).

   Thus, we do not find Plaintiff's new evidence to be either relevant or material to his

claim that Defendant acted arbitrarily and capriciously in terminating his LTD benefits in August

2002 since it failed to consider his physical and mental impairments in combination.

---

   [11]A GAF (Global Assessment of Functioning) score of 65 indicates some mild symptoms
(e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school
functioning (e.g. occasional truancy, or theft within the household), but generally functioning
pretty well, has some meaningful interpersonal relationships. *Diagnostic and Statistical Manual
of Mental Disorders* 32 (4th Ed. 1994) ("DSM-IV").

As his second claim, Plaintiff argues that Defendant acted arbitrarily and capriciously by solely relying upon Dr. Porter's opinion regrading his functional capacity without affording any credibility to his subjective complaints or the opinions of his treating neurosurgeon, Dr. Sedor. (Doc. 24, pp. 19-22).  We find, as detailed above, that Defendant's decision to terminate Plaintiff's LTD benefits did in fact consider Plaintiff's subjective complaints of pain as well as the opinions of Dr. Sedor.  We do not find that Defendant relied only on Dr. Porter's opinion with respect to Plaintiff's functional capacity to perform work.  We find, based on the undisputed material facts of this case discussed in detail above, that Defendant based its decision on all of the medical evidence in Plaintiff's record, including Plaintiff's own statements and the records and reports of his treating physicians, as well as Defendant's medical consultants.  The record is replete with all of Plaintiff's medical records.  We also agree with Defendant (Doc. 19, p. 10) that Plaintiff's Complaint does not even claim that Defendant failed to consider his complaints and the opinions of Dr. Sedor.  (Doc. 1).  We further find that Dr. Porter's opinion was well supported by the medical evidence discussed above.

In  our case, Defendant has more heavily weighted the opinion of Dr. Porter, who reviewed Plaintiff's file and medical records, than it has the opinions of the Plaintiff's treating physician, Dr. Sedor.[12]   We do not find that this was arbitrary or capricious to do so.

---

[12] The Supreme Court, in *Black & Decker v. Nord,* 538 U.S. 822, 123 S.Ct. 1965 (1970), held that an insurance company need not attribute more weight to the opinion of a treating physician than that of a physician hired by the insurance company.  In  our case, we find that Defendant did not arbitrarily refuse to credit the opinion of Plaintiff's treating physician, Dr. Sedor, and that Defendant did not summarily reject Dr. Sedor's opinions as Plaintiff claims. (Doc. 24, p. 21).  Rather, we find that the medical evidence, including Dr. Sedor's own treatment  notes, supported the opinions of Dr. Porter even though he was a physician hired by

In any event, based on the discussed record, which we do not now repeat, Defendant considered all of Plaintiff's medical evidence as well as his complaints in making its decision, and thus Defendant acted reasonably and its decision was not arbitrary or capricious.

As his final claim, Plaintiff argues that Defendant acted arbitrarily and capriciously by only providing the vocational rehabilitation consultant with Dr. Porter's report and not with all of Plaintiff's relevant medical records, including Dr. Sedor's reports.  (Doc. 24, p. 23-24).  Plaintiff claims that Defendant "cherry-picked" which portions of his file and records it sent to the consultants in order to garner evidence to support its decision to terminate his benefits. (*Id*.).  We disagree with Plaintiff.

As we indicated above, it is undisputed that on June 27, 2002, Dr. Porter completed an IPC Report.  (Doc. 20, ¶ 21.).  Dr. Porter considered Plaintiff's records, including reports from his treating physicians, and concluded as follows:

> The information, however, does not demonstrate significant impairments at the present time to require ongoing work loss. He has ongoing lumbar complaints but no indication of ongoing spinal cord or nerve root impingement.  He has undergone surgery to repair his condition and there is no indication of inappropriate surgery, complications of surgery or reinjury that would explain his ongoing pain complaints.  The complaints are out of proportion to his pathology.  Similarly he has symptoms of numbness to his right 4th and 5th fingers which would not significantly impair his functional abilities.  If there is significant

---

Defendant.

> concern over his function, a transposition of the ulnar nerve would
> be appropriate.  The information, however, is consistent with his
> ability to perform sedentary work duties with repetitive use of his
> upper extremities.

(A.R. 130-131).  Dr. Porter also found that Plaintiff had adequate time to recover after his

September 2001 surgery for his lumbar condition, and that "there is no indication of significant

neuromuscular deficits in [Plaintiff's] lower extremities at the present time."  Dr Porter

concluded that Plaintiff "has the ability to return to light work duty with lifting up to 20 pounds

maximum and 10 pounds on a repeated basis ... ."  (A.R. 131).

In August 2002, Dr. Porter prepared a second IPC Report which has been discussed in

detail above.  Dr. Porter considered Dr. Sedor's treatment records of Plaintiff, and found that

Dr. Sedor's own exam of Plaintiff showed Plaintiff had a normal straight leg test as well as

normal lumbar flexion.  (A.R. 118).  Dr. Porter concluded that "the information in Dr. Sedor's

records does not support significant restrictions of work duties."  Dr. Porter indicated that there

was no evidence that Plaintiff's surgery was other than successful, and no evidence that Plaintiff

had reinjury after his surgery.  Dr. Porter also considered Plaintiff's subjective complaints of pain

and found that they were out of proportion to the medical findings regarding his condition. (*Id*.).

The record is quite clear that Dr. Sedor's opinions were considered and discussed in Dr.

Porter's Reports which were provided to the vocational rehabilitation consultant.  However, as

Dr. Porter found, Dr. Sedor's own treatment notes did not show that Plaintiff lacked the

functional ability to perform all work.  Rather, the Plaintiff's medical records, as discussed

above,  supported Dr. Porter's assessments of Plaintiff's functional capabilities.  Nor do we find

any merit to Plaintiff's claim (Doc. 24, p. 23) that Defendant acted arbitrarily in failing to send

the vocational consultant Dr. Sedor's reports of June 24, 2000 with the rest of his file.  These reports of Dr. Sedor were before Plaintiff had his lumbar surgery in September 2001.  Also, as mentioned, Dr. Sedor's more relevant reports of his exams of Plaintiff after the surgery were considered in Dr. Porter's Reports which were provided to the vocational consultant.  These post-operative records of Plaintiff were certainly more relevant than the pre-operative records.

The fact that Defendant relied on the opinion of a non-examining consultant physician who conducted an independent medical review of Plaintiff's condition does not show that Defendant's review process was inadequate, since Dr. Porter based his findings on Plaintiff's medical records, including the reports of Plaintiff's treating physician.  Thus, in considering Defendant's decision to accord more weight to the opinion of a non-examining consultant physician than a treating physician, which consultant physician relied upon Plaintiff's pertinent records, and applying the heightened arbitrary and capricious standard, we find that the termination of benefits was reasonable and not arbitrary and capricious.

In short, the record simply does not support Plaintiff's contention that Defendant "cherry-picked" portions of his file to gain support for its decision to terminate his LTD benefits. In the case at bar, we find no evidence that Defendant has chosen to selectively read portions of the Plaintiff's records.  The record reveals that Plaintiff's own medical records were in fact considered, including his subjective complaints of pain and the records of his treating physicians,  as well as the reports of Dr. Porter and the vocational consultant.  We find that Defendant's decision to terminate Plaintiff's LTD benefits was reasonable, not arbitrary and

capricious, and amply supported by the whole record.  Accordingly, we will grant Defendant's

Motion for Summary Judgment and deny Plaintiff's Summary Judgment Motion.

    An appropriate Order will issue.


        **s/ Thomas M. Blewitt**
        **THOMAS M. BLEWITT**
        **United States Magistrate Judge**

**Dated: May 16, 2006**